Filed 2/9/22  In re L.G. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re L.G., a Person Coming Under the Juvenile Court Law. | B312524 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 21CCJP00008A) |
| Plaintiff and Respondent, | |
| v. | |
| L.T., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Stephen C. Marpet, Judge Pro Tempore. Affirmed.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Tracey Dodds, Principal Deputy County Counsel, for Plaintiff and Respondent.

———————————

L.T. (mother) appeals from the order in the dependency case of her child, L.G. Mother contends that substantial evidence did not support the juvenile court's findings that the presence of weapons, ammunition, and illicit drugs in various locations throughout the home where she and L.G. previously resided and her use of marijuana put L.G. at substantial risk of serious physical harm as described by Welfare and Institutions Code[1] section 300, subdivision (b).[2] We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother and father are the parents of L.G. (born 2017). Father has been incarcerated since before L.G. was born and is not a party to this appeal.

### A. *Background*

On April 17, 2020, officers of the Los Angeles Police Department armed with a search warrant arrived at the residence of the maternal grandmother, with whom mother and L.G. lived, and verbally announced themselves before forcing entry. According to the police report, law enforcement made contact with six individuals in the living room, including mother.

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] Mother appealed the jurisdiction/disposition order but addresses only jurisdictional issues on appeal. Mother therefore waives any challenge to the dispositional order made by the juvenile court.

Officers also came across L.G. in the rear bedroom. During the search of the home, officers seized two loaded handguns, a semi-automatic rifle, a large amount of live ammunition, $247, a bulletproof vest, and a large amount of pills resembling oxycodone, codeine, promethazine syrup, and methamphetamine. The drugs and weapons were located in or on various cabinets, closets, dressers and nightstands in the living room and the front and rear bedroom. Officers also located a black backpack in the front bedroom containing a loaded firearm, a large amount of pills resembling ecstasy, oxycodone, hydrocodone, and a large amount of US currency ($1,478). Mother was arrested and charged with conspiracy to sell narcotics.[3]

Prior to service of the search warrant, two plain clothes officers had observed mother meeting with multiple individuals in front of the residence. During these interactions, mother was seen handing the individuals an unknown object and in exchange was handed an unknown amount of US currency, at which time the mother would reenter the residence. In her written statement to the police, mother stated that the drugs were not hers but that the maternal uncle had asked her to sell drugs to whomever came to the residence. According to her statement, mother sold narcotics to four or five individuals that day.

On November 13, 2020, approximately seven months after the police raid on the maternal grandmother's home, the Los Angeles County Department of Children and Family Services (DCFS) received an emergency response referral alleging general

---

[3] The record contains conflicting evidence regarding whether any of the weapons located in the maternal grandmother's home were registered to mother.

neglect based on mother's arrest in April 2020.[4] The referral noted that mother was not in custody and was presumably residing at the maternal grandmother's house.

A children's social worker (CSW) interviewed mother on November 23, 2020. Mother denied that she had been selling drugs and claimed that she had no knowledge of the guns and narcotics found in the residence. She stated that, on the day of the incident, maternal uncle had informed her that a friend of his would come to the residence to drop off $80, and that when she went inside after taking the money, she heard the police outside demanding entry. She further stated that she informed police that the backpack containing drugs belonged to maternal uncle and that she knew he sold marijuana. Mother had also told police that the maternal uncle did not live in the home but at times left his belongings there. Mother expressed to the CSW that she was willing to move out of the maternal grandmother's house if necessary.

Mother also denied using illegal drugs but informed the CSW that she smoked "a dime" of marijuana outside the home after work to help her sleep. On December 2, 2020, the CSW reviewed mother's and maternal grandmother's drug test, and they both tested positive for high levels of marijuana.

The CSW also examined L.G. and found her to be healthy and developmentally on target.

B. *Petition and detention*

On December 30, 2020, DCFS requested a warrant for the removal of L.G. from mother, which was granted the same day,

---

[4] The record contains no explanation for the delay between mother's arrest and the referral of the matter to DCFS.

and L.G. was placed with the maternal great-aunt. On January 4, 2021, DCFS filed a section 300, subdivision (b) petition regarding L.G. The petition alleged that mother created a detrimental and endangering home environment because illicit drugs, paraphernalia, and loaded guns were found in the child's home, within access of the child (count b-1), and that mother was an abuser of marijuana, which rendered her incapable of providing regular care to L.G. (count b-3).[5]

At the detention hearing, the juvenile court expressed concern about the delay between mother's arrest in April 2020 and DCFS's actions with respect to L.G. The court nevertheless found that a prima facie case existed and showed that L.G. fell within the description of section 300. The court released L.G. to her mother and ordered that mother's "marijuana levels are to go down and out" and that mother move out of maternal grandmother's home and in with maternal great-aunt. The court ordered that mother drug test for DCFS on a weekly basis.

C. *Jurisdiction and disposition*

DCFS interviewed mother again on January 27, 2021. Mother, who was living with the maternal aunt, maintained that she had no knowledge of maternal uncle's activities in the maternal grandmother's home and had nothing to do with the weapons and drugs recovered by police officers there. She asserted that they had only been found "in the front" and were

---

[5] Count b-2, which is not at issue on appeal, concerned father and alleged that his extensive criminal history endangered L.G.'s health and safety and placed her at risk of serious physical harm, damage, and danger. The juvenile court ultimately dismissed this count.

5

thus inaccessible to L.G. Mother claimed that she wanted nothing more to do with the maternal grandmother's home and that the family was selling the home because of the issues they had experienced with the police there.[6]

Mother also disclosed to the CSW that she had previously smoked marijuana early in the morning to help her appetite and at night after work, but did so outside, when L.G. was asleep, and that L.G. was not exposed to her marijuana use. Mother reported that, since she stopped smoking marijuana, she had a shorter temper with customers at her place of work, but that she probably would not return to using it after the case was resolved as she did not feel like she needed it.

DCFS subsequently interviewed the maternal great-aunt and the paternal grandmother. The maternal great-aunt stated that the maternal uncle frequently caused trouble in the home where mother and L.G. previously resided but denied that mother was directly involved. The maternal great-aunt also informed the CSW that she had only ever seen mother smoke marijuana outside the home and without L.G. present, and denied that mother had smoked marijuana since moving in with her. The paternal grandmother similarly reported that she believed that mother used to smoke marijuana and saw mother do so outside, but had never observed mother smoking with L.G. present.

Mother did not appear for her first drug test because she was not provided with the information to call in daily, and was unable to provide a sufficient sample at the second test. She

---

[6] DCFS was unable to confirm or refute whether the house had been listed for sale or was sold.

tested negative for all substances in the nine subsequent drug tests in the record.

On February 17, 2021, DCFS filed the jurisdiction/disposition report with the court. DCFS recommended that mother continue with weekly, random drug testing. DCFS also recommended that mother participate in parenting classes and individual counseling to explore case issues and any unresolved trauma stemming from the April 2020 incident.

At the jurisdiction and disposition hearing on April 26, 2021, L.G.'s counsel asked the court to sustain the petition based on the presence of drug paraphernalia in the maternal grandmother's home and mother's prior use of marijuana. Mother's counsel urged the court to dismiss the counts against mother on the grounds that she had moved out of the maternal grandmother's home and DCFS had not shown her present home to be a detrimental environment, and because mother's drug tests were negative for all substances. Counsel for DCFS submitted on the record.

The juvenile court sustained the allegations against mother and, consistent with DCFS's recommendations, the court ordered that L.G. be placed with mother under DCFS supervision; that mother attend and complete a parenting class; that mother participate in weekly, random drug testing; and ordered family preservation services for mother. Mother timely appealed.

**DISCUSSION**

Mother contends the court's jurisdictional findings based on her conduct were not supported by substantial evidence because there was no evidence that (1) L.G. remained at significant risk of harm arising from the presence of illegal drugs and loaded guns

7

in the home after mother and L.G. moved in with maternal great-aunt, or (2) mother currently abused marijuana. For the reasons that follow, the contentions are without merit.

## I.     Standard of review

The juvenile court made the decision that is the subject of this appeal under Section 300. "Section 300, subdivision (b), allows a child to be adjudged a dependent of the juvenile court when '[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's . . . substance abuse.' " (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1215.)

"Although section 300 generally requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*In re Christopher R.*, *supra*, 225 Cal.App.4th at pp. 1215–1216.) "The court may consider past events in deciding whether a child currently needs the court's protection." (*Id*. at p. 1216.) "A parent's ' "[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' " (*Ibid*.)

We review a juvenile court's jurisdictional findings for substantial evidence. " 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the

evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.) " ' "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*Ibid.*)

## II. Substantial evidence concerning the presence of illicit drugs and weapons in the home supported jurisdiction

The juvenile court's jurisdictional findings with respect to count b-1 were supported by substantial evidence. There can be no real doubt that a child is at risk of serious harm in a home where multiple loaded firearms and narcotics are present in various cabinets, closets, dressers, nightstands, and backpacks. (See *In re Yolanda L.* (2017) 7 Cal.App.5th 987, 995 [child with access to loaded gun "is at substantial risk of serious physical harm."]; *In re Rocco M.* (1991) 1 Cal.App.4th 814, 825 [substantial risk of harm existed when child was in an environment allowing access to drugs] disapproved on another ground in *In re R.T.* (2017) 3 Cal.5th 622, 629–630.) The presence of loaded weapons and drugs within L.G.'s access created the danger that she might accidentally discharge a firearm or ingest narcotics.

Moreover, though mother subsequently denied that she sold drugs or had any knowledge of the drugs and weapons in the home, mother acknowledged in a written statement to police that she sold narcotics to multiple individuals in front of the maternal grandmother's home, and two police officers observed mother engaging in these activities. As courts have recognized in other contexts, the "drug trade is fraught with danger." (*People* v.

9

*Duarte* (2007) 147 Cal.App.4th 1231, 1237.)  There was a possibility that individuals purchasing drugs from the maternal grandmother's home might attempt to take them by force, subjecting L.G. to the risk of injury.  Thus, the evidence supporting that drugs were sold from the residence where L.G. lived bolsters the finding that there was a substantial risk of harm to her under section 300, subdivision (b).  (See, e.g., *In re Yolanda L.*, *supra*, 7 Cal.App.5th at p. 994 [substantial risk to children existed where juvenile court could reasonably conclude that father's drug trafficking activities sometimes took place in the family home].)

Mother argues that the evidence was insufficient to support jurisdiction because she had left the maternal grandmother's home and moved in with the maternal great-aunt prior to the jurisdiction and disposition hearing.  Mother asserts that the police raid at the home where L.G. resided, "was, for the intent of removal by the Department and the juvenile court, nine months old."

However, as other courts have stated, "[o]ne cannot correct a problem one fails to acknowledge."  (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.)  Although mother expressed willingness to leave maternal grandmother's home before it was ordered by the court as a condition of L.G.'s release and later disclaimed any desire to return there, the evidence in the record supports that mother failed to acknowledge the risks posed to L.G. by their previous living situation.  For more than eight months after the police raid, mother remained in the same home where the maternal uncle was known to leave his belongings, including narcotics and firearms.  Mother moved in with the maternal great-aunt only after the juvenile court made residence

in a DCFS-approved home a condition for L.G.'s release to mother. Without DCFS intervention, it is possible that mother might return to the maternal grandmother's home.

Further, in her interviews with DCFS, mother appeared to discount that the presence of drugs and weapons in the home subjected L.G. to risk of harm. Mother contended that L.G. had not been in danger because the drugs and guns purportedly did not belong to mother and were inaccessible to L.G. because they were found "in the front" of the residence. Mother did not, however, dispute at the jurisdiction and disposition hearing or on appeal that the weapons and drugs were within access of the child, as DCFS alleged. Moreover, the police property report stated that certain narcotics, a handgun, a rifle, and ammunition were located in the rear bedroom, where it appears L.G. was at the time of the police raid. The absence in the record of any recognition by mother that access to narcotics and loaded firearms is dangerous for a young child provides support for the potential of future harm. (See *In re Yolanda L.*, *supra*, 7 Cal.App.5th at p. 996 ["father's lack of insight into the danger posed by the loaded gun in the home provided support for the potential of future risk"].)

The circumstances here are therefore distinguishable from those present in *In re Ma.V.* (2021) 64 Cal.App.5th 11, on which mother relies for the proposition that "stale" evidence cannot support jurisdiction. There, the jurisdictional hearing took place 10 months after the three children, aged 10 to 16, were detained from mother, and the Fourth District found that "the juvenile court's jurisdictional rulings focused on old issues that were resolved by the time of the jurisdictional hearing." (*Id.* at p. 21.) Mother's abusive boyfriend had left the family home, mother had

11

broken up with him and had no contact with him for 10 months, and mother had not resumed any new romantic relationship. (*Id.* at p. 22.) Moreover, a social worker had testified that mother's use of marijuana was no longer a concern to social services, and the juvenile court had found this testimony credible. (*Id.* at p. 23.) Finally, with respect to the claim that mother had failed to obtain mental health services for her eldest child, the court noted that social services had not placed the child in individual therapy, the child had not suffered any mental breakdowns during the 10-month period, and the child testified that the mother had taken her to the hospital when she had thoughts of self-harm in the past. (*Ibid.*)

Unlike here, *In re Ma.V.*, *supra*, 64 Cal.App.5th 11 did not involve a child of tender years with access to loaded guns and narcotics, nor did social services argue that the mother failed to acknowledge the risks present in the family home. In fact, the juvenile court in *Ma.V.*, at page 20, "conceded . . . Mother had evolved and recognized and verbalized that she was a victim of domestic violence." There was no such recognition and verbalization by mother in this case. Although mother left the maternal grandmother's home, she continued to deny any knowledge of the drugs in the home, notwithstanding her own written statement to the contrary, and to minimize the risks that access to drugs and loaded firearms posed to L.G. Thus, the juvenile court could reasonably conclude that the risks present at the time of the police raid had not been resolved, even if no further incidents had taken place.

Substantial evidence therefore supported the juvenile court's jurisdictional finding with respect to count b-1.

## III. The court need not reach the alternative ground for jurisdiction

Because we have concluded that the evidence put forward in support of count b-1 provided a basis for jurisdiction under section 300, subdivision (b), we need not consider whether mother's marijuana use provided an alternative basis for jurisdiction. "[A]n appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence." (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1492.) We therefore do not address mother's challenge to the juvenile court's finding as to count b-3 of the petition.

## DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED.


LIPNER, J.*


We concur:



EDMON, P. J.          LAVIN, J.


_____

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.